Brett Savage is here for Appellant Jenkins. Thomas Christopher is here for Appellee Nell and Mr. Savage, you may begin. Thank you, Your Honor. I represent Billy Jenkins, whose case was thrown out of the District Court on summary judgment. It's what would commonly be called a reverse discrimination case. It is a case where Mr. Jenkins said he was fired improperly because he was targeted as a white person by the defendant in the case, Karl Nell, who is head of the crane operations here in Savannah. There are two reasons that the court principally threw us out. One is that we had no comparators, they said. We have pointed to four comparators, and I'd like to discuss those to start with, who, because we believe they are black, were treated very differently than Billy Jenkins. Billy Jenkins had a very good record as a crane operator before the afternoon of August 8th when, against court rules, Karl Nell sought him out, got in his face, and told him he better not go to HR, which is against their rules. In this decision, the court really doesn't discuss what the court itself says was wrong with what Karl Nell did in this case, which is to confront a man who says that he had HR in his pocket, who was alerted to Billy Jenkins going to human resources. Before you move to the next, let me just ask you this question. Sure. He was fired for insubordination. Right. Well, no. They've morphed their story. He was fired because he refused to leave. Once they found out that he left within four to five minutes of the time that they had this discussion where Nell confronted him, he was out the gate by 6.05. The fight took place right before six o'clock there. Then they morphed it into insubordination, and that is very suspect here. If you look at Chisholm... Let me ask the question. Sure. In any event, insubordination is the reason that was given for his termination, right? No. It was not... No. If you look at Ms. Chisholm's testimony who fired him in this case on the 11th of August, she said he was fired for failing to follow orders to leave the premises. She fired him. It's only after we get into the case with really good lawyers that they start to morph into this insubordination thing. So my question is, were any of the comparators, were they subject to the same discipline? They are all subject and all were given a pass, these four black comparators, for Schedule A violations. That's the most serious violations of the court. So the common denominator is Schedule A violations. All right. I don't want you to spend all of your time on this issue, but it just seems to me that the comparators did not engage in the same basic misconduct as to Mr. Jenkins. Am I wrong about that? With all due respect, I think you are. You certainly are taking the tack that Judge Moore took in the case. But my point is the Schedule A violation is the only thing that can get you fired. Judge Moore made a big distinction between Randy Jones. You know, the reports are a little rough. Some of the language that's in the brief is a little rough. Randy Jones is a black operator who threatened to take Carl Nell outside the gate and, quote unquote, beat his ass. That's a Schedule A violation. So why is he not a good comparator when they say we refuse to direct order to leave right away and that's why we were fired? Why is that not a good comparator? The second comparator is a black operator who's still with them. Brian Jackson, who is a good guy, who told HR that Carl Nell was going around saying that he was going to pencil whip anybody who went to HR, that he was like an 18-wheeler, that he would back over you and then back over you again if you dared go to human resources, and that if you go to the White House, which is where HR is, I'm going to get your job. That's what Nell said in these cases. Those type of statements go to whether or not the thing that they come up with in the end is a pretext. I mean, this is hard. I wish it were different. It kind of makes you sick at your stomach that we haven't advanced any better, these racial issues. But they've got to be dealt with courts rather than the stuff that we're seeing now with the Maud Arbery case. Courts have to give people access to air their grievances in these cases. With Brian Jackson, who goes in there and they're saying he's insubordinate, Billy Jenkins, Brian Jackson is saying that this guy is saying, I'm going to throw guys under the bus. Nell says, I don't remember ever saying that. So you either have to say that Brian Jackson is telling the truth or he's not telling the truth. If he's telling the truth, Carl Nell should be gone. I mean, the head of HR, Lisa Altman, says, you know, this is horrendous. If you believe these affidavits, Mr. Savage, that you put in from these white operators. When we start into this thing, there are 18 white operators who are gone. Now, some retired and there were more white operators to start with. There's one black operator who is gone. It's a fluid thing, but this is when we were litigating the case, a guy named Ed Smith. He took the house off of the ship, unfortunately. I'm sure he's got many merits. But instead of getting him, the black operator, Ed Smith, Nell is on record in the affidavits here saying if Ed Smith had just agreed to change his testimony, change his testimony, he would still have a job. But he wouldn't listen to me on these things. So when it's a black operator, if you're looking at comparators, he goes to them, says, change your testimony, change what really happened. And you'll preserve your job with Billy Jenkins. See, what they did is they assumed the assumption. They assumed that Jenkins didn't leave. Well, he left right away. So then when Chisholm comes in and says I fired him for failing to obey a direct order. You've got guys who they rely on. Dan Rody who's head of the crane up I mean the container operations out there. So it seems to me it was pretty reasonable that he left quickly. So they morph the story. And that's, that's a key indicator of whether these ideas that they're giving you are pre textual. In this case, you know, the last comparator. So moving from that moving from the issue of regard to whether or not he has proper comparators. So what what can you tell us to convince us that summary judgment was inappropriate given, as you indicated in your brief, a convincing mosaic of discrimination of discrimination. Well, yeah, you know, you just have this new Lewis case where a lady was fired black lady from Union City Police Department. And the court reversed the district courts grant of summary judgment to Union City, saying, you know, these are subtle things with the mosaic here of facts. I mean, this is an unbelievable record, I'm embarrassed to be in the state of Georgia which sanctions in the record, where a former employee chat taisha Randolph, who's an African American said when she started with him, another African American, he says to her. We blacks got to stick together. This is a racist department. In this case, and Billy Jenkins, who, you know, I used to think we treated veterans. Pretty well, but I've disabused me of that. He's got three years in Afghanistan, three years in Iraq, a two year old kid and he's gone. In this case from a guy who says that we blacks got to stick together. We white shouldn't stick together we black shouldn't stick together. This case needs to go to a jury. I happened and I don't know how I got in but a long time ago went to University of Virginia so I'm trying to read stuff that Thomas Everson wrote, he wrote to Thomas pain he said the only way to hold the government accountable for what they should do in jury trials is, is to have jury trials to hold them accountable for what the Constitution says they got to do. And this whole idea that jury trials are going, it's very scary to me. All these inferences that were in the case. In this case, if you look at Lewis is kind of our, our blueprint, where the lady was fired. When she was on permanent leave the court went to these and dishes. It said that there was suspicious timing in her firing she was fired about two weeks after they gave her an unlimited leave. Carl now does not want people to go to HR on him. He was tipped off, which the port itself says it, and he's been fired for insubordination insubordination would be violating a proper order. The port itself Lisa Altman says if you agree, if I listen to what you say savage that he's saying, I'm going to get people to go to the White House. I'm going to be vindictive to these people. We never should have tipped them off. Now goes into the break room. It's right in Billy Jenkins his face and said, you better get your facts straight, and you better not. When you go to HR he never should have known he was going to. This thing is out of control down there and it's certainly with this mosaic of circumstantial evidence. There's suspicious timing he wants to cut Billy Jenkins off, and he did a great job of it because he changed the whole dynamic from what is what where they start on the wrong track is about six months earlier, where Jenkins says I had a hard landing hard landings are when these 80,000 pound containers are landed on the trailers, the jockey truck drivers can't get out, and they get hurt, Billy Jenkins said I had a hard landing on this stuff. Now didn't like that at all. So he sends three surrogates Philip Wong and Matt start to. Now it says you better change your statement on the official police report. Now his whole agenda as he says to Tysha Randolph who signed an affidavit for us is I can't control these white operators. They're racist. If the white operators and some black operators have a meeting where they're going to, you know, retirees he calls it a Ku Klux Klan meeting. We got to be better than this. This mosaic that's put together. They have ambiguous statements on why they fired him they change their statement on why they fired him. The person who fires him is called now. And he's involved in in the firing if you look at Tanya Chisholm, who is an African American HR person she says now fired him. And we fired him for disobeying a direct order. Well the problem is none of them knew that he had in fact left the premises within six or seven minutes. All right, let's hear from this person. Yes, sir. Thank you for your time. Good morning, may it please the court. I'm Tom Christopher I'm representing the individual Carl now who is the defendant happily in this case. Mr. Now was one of seven Georgia Ports Authority managers who concluded that Billy Jenkins had acted inappropriately in an insubordinate fashion, and that termination was the appropriate remedy. Well, let me ask you a question. Is it what Mr. Savage was referring to that he was let go by Miss Chisholm for failing to leave the premises was that not the initial reason that he was let go. Is that not what the record shows. He was let go for his behavior. On the occasion when he was told to leave. You can put it several ways. I mean he would what happened was that he was told to leave. He said, I'm not going anywhere. He was for the second time instructed by the department manager who was several layers of management above him to leave he said I'm not going anywhere. He was continuing to do, and this was all in the middle of the crane department building in front of other employees other managers. And at the time that Nell tells him well, you know, we'll see you in HR in the morning because Nell was going to deal with his discipline at that point. And as of the time Nell left the building and left Georgia Ports, Mr. Jenkins was still defying the department manager. You can say he, I mean at some point, so it's either a yes or no. Was that the initial reason that he was let go, was that he refused to leave the premises, it's either yes or no. It's the same thing. It is yes it is because he isn't there a factual dispute as to whether or not he did in fact leave the premises. Your Honor there, there is not. He, in the first place, I mean, refusing to leave the premises and insubordination are the same thing. But it's not it's not it's not insubordination if he in fact didn't leave the premises correct know if he defies his manager for a period of time tells him he's not going to do what he was told to do remain is continuing to defy his manager. While that man. Did he not leave the premises on the day that he was instructed to. Oh, he certainly left on the day he was instructed. Not before his supervisor left the premises. Not before he made a speech to his fellow employees about how this was poisoning the department. Not before he went outside talk with some of his other co workers about what about the situation, then came back inside. Then another employee came back inside and Mr Jenkins was still there. And following all that he did leave the premises. He was not terminated for moving too slowly. He was terminated because he was told to leave he said he was not going to do it well manager was there. He was refusing to do it. And we would submit that that is a reasonable cause for an employer to terminate an employee. The Let me ask you this question, Mr. Mr Christopher. When I look at this record. There is evidence that Randy Jones, an African American employee also engaged in a rule a violation like Mr Jenkins, but remain Employee. There is in this record, at least 18 white crane operators who retired or resign or transferred from the department since Mr now took over as their supervisor. We've got some comments in the record that are attributable to Mr. Now that could reasonably be construed as racially biased comments about white crane operators. And it also appears that there are different reasons here for terminating Mr Jenkins. And so why couldn't a jury. Take all of these facts in the consideration in determining that There was there was there was discrimination on the basis of Mr Jenkins rights. If I could take those points one at a time, Your Honor. With regard to the whites departing the first thing I should say is that the references to only one African American employee be terminated by Mr Jenkins is incorrect. The I'm sure it's inadvertent counsel overlooked paragraph 10 of Mr Nels affidavit, which he indicated at that time for individuals for African Americans has been terminated. There is no indication as to why the 18 White employees left. It's, it's clear that most of them were retiring retiring. It's not such a bad thing, at least from my perspective. It's certainly not. There's certainly no indication that it is a negative factor. And there was no effort here to make a statistically significant Showing of any kind. We don't know how many employees that were there was no indication of why these people left. There's no indication of where they were, how close they were to retirement any what the statistics were any of those things. With regard to the different reasons, as I say, it's, I mean, as far as the ports concerned, it's the same thing. I mean, he was he was told to leave. He didn't leave for a while. The argument of the plaintiff was that he was not in subordinate long enough, in effect, but telling your supervisor twice that you're not going to leave is a refusing to leave and it'd be in subordination and they're basically the same thing. And The it's slicing and I think way too too close to say that these are different comments at all. It has been clear from the beginning that his throughout the record that his behavior on this occasion was the reason for his termination. With regard to the, the comments, the, the comments that were made were that Mr. Nell suspected certain people of being Biased that is not a an indication of racial prejudice. All of us have said that about some people at sometimes the courts say that people who filed charges say that Mr. Jenkins has said that And in any event, the comments were made. Well, they were reported. First of all, by Taisha Randolph, who was one of the African Americans who were terminated from the department. Was overlooked. That Miss Randolph wasn't even there when Mr. Nell was there. He was not required to go into this job with the idea that The world was a perfect place and there weren't any people who racially biased out there, but he did not make any class based comments. There's no evidence that he said all whites were bad or all whites were prejudice or all whites in the department were prejudice or anything of that nature. So we don't think that that the comments are Provative With regard. Oh, by the way, I should point out that there was reference to Mr. Jenkins overseas service. The record is clear. Mr. Jenkins has never been in the United States military The With regard to that. I'm sorry. Go ahead. With regard to the comparators Well, Before you get to the comparators, you know, I went through a litany of Facts that a jury could take into consideration and determining that Mr. Jenkins was subject to discrimination and you gave an explanation, but it sounds more like a closing argument. Why couldn't a jury come to a contrary conclusion. Because the facts are and it's undisputed what Mr. Jenkins did. It was shown by Written statements provided by managers. It was he has admitted what he did. And so, so what he did is clear. The fact that what he did is a reasonable ground for termination. Both the terms insubordination and refusing to leave are talking about exactly the same thing. It, we would submit. It's not a jury question as to which words in the particular rule were selected at a particular time. It was perfectly reasonable for Georgia ports today that he did not leave when he was told to leave. And that's why he was fired. With with regard to the to the comparator issue. One individual referred to was Ed Smith. He was fired. Several other African American individuals were fired with regard to Randy Jones. He was not accused of doing the same thing. And in fact, the situation is a great contrast. Number one, there's no evidence that it was Mr. Nell who made the decision not to fire him. The matter was presented to Mr. Nell's boss, Mr. Jones testified that Mr. Nell proposed that he fired and that his boss overruled him. A second major distinction is that Mr. Jones comment, which obviously was inappropriate. He testified without contradiction that it was a joke that he was quote talking trash. Nobody has Mr. Jenkins hasn't claimed that he was joking. When Mr. Jenkins when Mr. Jones made his comment or actually before he made the comment. Mr. Nell instructed him to come to leave the meeting and come with him. Mr. Jones immediately complied. He went where he was instructed. I met with Mr. Nell's Caucasian boss who, according to Mr. Jones contradicted the what Mr. Nell wanted to do and said he wasn't going to fire him. Mr. Jones was instructed to return to the meeting and apologize. Mr. Jones immediately did so, whereas Mr. Jenkins has never apologized or admitted error or admitted he did anything wrong. Whatever one may think of those two situations, they are materially different. And Mr. Nell's boss was entitled to take a different opinion. And in fact, Mr. Nell's boss is not going to use racial discrimination here. So there's not even any evidence that that Mr. Nell made the decision that was at issue. The other comparators are even less materially the same as as Mr. Jones with regard to Mr. Jackson. He went to HR, made a complaint, considered it resolved and left. There's no evidence that Mr. Nell even knew that he was there or knew what he said or made any decision concerning him. That in no way shows that Mr. Nell was engaging in racial discrimination when he took action or, excuse me, participated with a number of other managers in taking action against the plaintiff. The fact of the matter is that there is no evidence that any individual has ever done what Mr. Nell had had to endure with with Mr. Jenkins, much less get away with it, which is what Mr. Jenkins's claim should have happened. There was undisputed evidence that Mr. Jenkins did exactly what he was accused of doing. A variety of people considered the circumstances and concluded that determination was appropriate. This court has held it doesn't sit as a super personnel board to second guess decisions and to issue clemency in effect when an individual has committed an offense. And in fact, here there was no remorse by the individual. He has yet to acknowledge that he did anything wrong. And yet we're asked to conclude that Mr. Nell should have contradicted his fellow managers and said that this guy should be put right back in the job where he would obviously be a very disruptive force. There was also no showing of pretext. I understand that the court has raised some of the issues regarding that. But as I said, the charges against the plaintiff were that it was all under the same rule. It was referring to exactly the same conduct that was done wrong. There was no contradiction in the evidence as to what he actually did. Mr. Nell was, we would suggest, permitted to join with other individuals to take a tough line on somebody who clearly was defying management and that it was within the within his right to do so. There was some reference to bullying statements by Mr. Nell that he was vindictive. Those arguments are, in fact, counterproductive. If Mr. Nell was vindictive and didn't like having his authority questioned, that would suggest that he got really mad when his authority was questioned rather than that he held it against Mr. Jenkins as to what his race was. All right. Well, we've allowed you to go on, Mr. Christopher. I think we have your argument. Okay, thank you. And Mr. Savage, you have reserved some time for rebuttal. Yes, sir. I'll be quick and I'll hit what I've marked down as eight quick points. Mr. Christopher makes the point that this was reviewed by upper management. Of those people that reviewed it, two reviewed it on appeal after he was fired. He was never, Billy Jenkins was never given a chance to say his side of the story before he got fired by Miss Chisholm on the morning of the 11th. Of those people that reviewed it, his upper management idea, one is Carl Nell and four are in the HR department. Nell has gone on record that saying he has HR in his pocket and he will know if you go to HR before you get out of there. And he is going to get your job if you dare go to HR. So that's the management. The concept that his behavior was bad in the break room up there. Lisa Altman is head of HR. She is saying that if we tipped off Carl now that he was going to HR, that we know that he's vindictive. He admits to that now that he's vindictive. This never should have happened. And that was outrageous behavior on our part. So that's what Mr. Christopher is saying. Well, he's act so crazy. They only moved this that he didn't leave when they didn't. They never checked the gate and you have to go in and out of gate. He was out of there by six or five on the gate. So he left. That's when they morphed their stories. He said, well, maybe it's inadvertent with Carl Nell that he said four people left Carl Nell for a year. When I took his deposition in various cases, Mr. Christopher and I are out there a lot. I have 80 cases out there. Carl Nell said I never knew he was going to HR and then change his testimony. So Carl Nell's credibility that I did know he was going out there when I confronted him. As to this other comparator, there's no good comparators. Michael Saucy heard a guy represent a guy by the name of Mr. Smalls. He files a police report where he lies that he never took his crane over the ship and then goes back. And Carl Nell knows this, that he did take the crane over the ship and hurt Smalls and he's still working there. That's a Schedule A violation. Everybody agrees that Billy acted bad. Philip Wong, who transferred out of there, they can't stand working in this environment. Philip Wong says I saw him. I saw him in that break room. Billy didn't act badly at any point. This thing that this is a joke that I'm going to take you outside. And, you know, it depends on which story you listen to beat the hell out of you or whatever it is. But that's not what Brannon and some of these guys say. It wasn't a joke. And the thing he was a contract employee. He served three years in Afghanistan, three years in Iraq, putting out fires at bases when rockets would come in. Tom, I think you just misspoke. I said that Randy Randolph wasn't even there. The woman who says that he told me as a new black there, he she worked for him. She was there. He told her we blacks got to stick together on this thing. Look, thank you for your time and we'll leave it with you. And God bless you. Thank you, Mr. Savage and Mr. Christopher. Thank you. Thank you. This court will be in recess for 10 minutes. I've never been before a celebrity judge. One. Well, I'm not going to say. Y'all take care.